# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 20, 2012          Decided February 8, 2013

No. 11-7018

ERIC SHEPTOCK AND COMMITTEE TO SAVE FRANKLIN
SHELTER, ON BEHALF OF ITS MEMBERS,
APPELLANTS

v.

ADRIAN FENTY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,
ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00672)

———

*George E. Rickman* argued the cause and filed the briefs for appellants.

*Stacy L. Anderson*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

Before: ROGERS and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case stems from the closure of the Franklin Shelter, an overnight facility for homeless men in downtown Washington, D.C. In two prior suits filed in the Superior Court for the District of Columbia, former shelter residents alleged that the closure violated D.C. law and the Fifth Amendment to the United States Constitution. In a third case, filed in federal court and on appeal here, plaintiffs allege that the closure also violated federal and D.C. antidiscrimination statutes. Because plaintiffs could have raised these latter claims in the Superior Court cases, we affirm the district court's dismissal on res judicata grounds.

**I.**

At the time the Franklin Shelter was operating, approximately 2,200 single adults were chronically homeless in the District of Columbia. *See* Second Am. Fed. Compl. ¶ 20; *see also Nader v. Democratic National Committee*, 567 F.3d 692, 694 (D.C. Cir. 2009) ("Because the district court granted defendants' motion to dismiss, [plaintiffs'] allegations must be taken as true." (internal quotation marks omitted)). Because the Franklin Shelter served as an emergency facility, residents were permitted to stay there only between 4 P.M. and 7 A.M. Although required to leave during the day, residents could keep their personal belongings in small lockers. Mirroring the District's homeless population, Franklin Shelter residents were disproportionately African American. *See* Second Am. Fed. Compl. ¶¶ 20, 28. Many suffered from psychological disorders and substance abuse problems. *See id.* ¶¶ 24, 28.

In mid-2008, Mayor Adrian Fenty and the D.C. City Council began making plans to close the Franklin Shelter. On September 16, the City Council passed the Franklin Shelter

Closing Requirements Emergency Act of 2008, which required the mayor to make certain detailed certifications before closing the facility. *See* D.C. Act 17-518. Before signing the Emergency Act, however, the Mayor closed the shelter and made none of the required certifications. *See* Second Am. Fed. Compl. ¶¶ 14–16.

Evicted residents were informed that their personal belongings had been moved to a homeless shelter in Anacostia and that they could receive transportation there if they wished. They were also encouraged to relocate to shelters outside Northwest Washington—the city's rapidly gentrifying commercial and residential area. *See id.* ¶¶ 14, 28, 33–37. And to "mitigate any loss of shelter space," *id.* ¶ 38, the District created the Permanent Supportive Housing Program to provide long-term housing and services to the chronically homeless.

The Franklin Shelter closing sparked a flurry of litigation. Specifically, former Franklin Shelter residents—including named plaintiff Eric Sheptock—and the Committee to Save Franklin Shelter brought three separate suits, two in D.C. Superior Court and one in the United States District Court for the District of Columbia. Because the outcome of this case turns on the application of res judicata, we describe each of these suits in detail.

The first case, *Sheptock I*, was filed in D.C. Superior Court on September 26, 2008, the day the Franklin Shelter closed. Plaintiffs brought two D.C. law claims, as well as a Fifth Amendment procedural due process claim premised on the District's failure to provide advance notice and an opportunity to be heard before closing the shelter. Shortly after initiating the case, plaintiffs filed a notice of dismissal, which terminated the suit.

While *Sheptock I* was pending, plaintiffs filed a second suit, *Sheptock II*, in D.C. Superior Court. The *Sheptock II* plaintiffs raised eight claims: a Fifth Amendment procedural due process claim; a Takings Clause challenge to the appropriation of the former residents' personal belongings; intentional infliction of emotional distress; conversion; negligence; and violations of the Emergency Act, the Frigid Temperature Protection Amendment Act of 1988, D.C. Code § 4-753.01, and the Homeless Services Reform Act of 2005, D.C. Code § 4-754.22. Plaintiffs twice amended their complaint to add new facts and allegations concerning the fallout from the Franklin Shelter closure.

Significantly for our purposes, on March 9, 2009, the *Sheptock II* plaintiffs filed a motion entitled "Motion to Stay Proceedings Pending Discovery and Pending Submission of Federal Claims in the United States District Court for the District of Columbia or in the Alternative Motion to Amend Complaint for Preliminary and Permanent Injunctions." In this motion, plaintiffs notified the Superior Court that they would be bringing claims in federal court under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq., the Fair Housing Act (FHA), 42 U.S.C. §§ 3601 et seq., and the D.C. Human Rights Act, D.C. Code §§ 2-1401.01 et seq. According to plaintiffs, further investigation had uncovered evidence concerning the Franklin Shelter's racial demographics and the widespread presence of disabilities in the homeless community. Based on these facts, plaintiffs alleged race and disability discrimination under theories of disparate treatment and disparate impact. Plaintiffs "move[d] [the Superior Court] to stay proceedings on defendant's motion for dismissal or summary judgment . . . pending plaintiffs' submission of federal [antidiscrimination] claims" in federal court. The motion included a seventeen-page discussion of the merits of plaintiffs' antidiscrimination

claims. Acknowledging that the Superior Court had jurisdiction to hear their federal antidiscrimination claims, plaintiffs nonetheless asserted that "[w]hile the splitting of claims is disfavored, the federal claims raised here are ones of a special nature and are claims of first impression, and warrant federal jurisdiction." In the alternative, plaintiffs moved to amend their complaint, attaching a third amended complaint that included the ADA, FHA, and D.C. Human Rights Act claims. Plaintiffs subsequently withdrew that request, reserving the right to re-file an amended complaint.

On May 11, 2009, the Superior Court granted the District's motion for summary judgment and denied all other pending motions, including plaintiffs' motion to stay. A year and a half later, the D.C. Court of Appeals affirmed. *See Baltimore v. District of Columbia*, 10 A.3d 1141 (D.C. 2011). In a footnote, the Court of Appeals held that the Superior Court had not abused its discretion in denying the motion to stay and that the antidiscrimination claims "could have been filed in the instant action and [plaintiffs] offer no persuasive reason why they were not." *Id.* at 1156 n.23.

While *Sheptock II* was pending in the D.C. Superior Court, plaintiffs initiated their third suit, *Sheptock III*, by filing a complaint in the United States District Court alleging violations of the ADA, FHA, and D.C. Human Rights Act. The *Sheptock III* plaintiffs also alleged procedural and substantive due process violations. Unlike in *Sheptock II*, plaintiffs brought no claims under the Takings Clause, the Emergency Act, or D.C. tort law. The *Sheptock III* plaintiffs named as defendants then-Mayor Fenty and three other officials, each in their individual and official capacities.

In early July 2009, the district court, responding to a motion to dismiss based on res judicata, stayed *Sheptock III*

"pending a decision by the District of Columbia Court of Appeals in a matter arising out of the same event that is the subject of this litigation." At the same time, the district court permitted plaintiffs to file a second amended complaint that added antidiscrimination counts challenging the District's Permanent Supportive Housing Program. As set forth in that complaint, plaintiffs' claims can be divided into three categories: Counts I through X allege that the Franklin Shelter closure violated the ADA, FHA, and D.C. Human Rights Act; Counts XI and XII allege that the closure violated plaintiffs' procedural and substantive due process rights; and Counts XIII through XVIII allege that the Permanent Supportive Housing Program violates the ADA, FHA, and D.C. Human Rights Act. After the D.C. Court of Appeals issued its decision in *Sheptock II*, the district court dismissed *Sheptock III* on res judicata and collateral estoppel grounds.

The *Sheptock III* plaintiffs raise two arguments on appeal. First, they contend that the motion to stay filed in *Sheptock II* insulates their claims from res judicata. Second, insisting that their challenges to the closure of the Franklin Shelter and to the District's Permanent Supportive Housing Program are factually distinct, plaintiffs contend that Counts XIII through XVIII fall outside *Sheptock II*'s preclusive effect. "We review a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) *de novo*." *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Similarly, we review the application of res judicata de novo. *See Ibrahim v. District of Columbia*, 463 F.3d 3, 7 (D.C. Cir. 2006).

## II.

We begin with familiar principles. "The federal courts have traditionally adhered to the . . . doctrine[] of res judicata." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Under that doctrine, also known as claim preclusion, "a final

judgment on the merits . . . precludes relitigation in a subsequent proceeding of all issues arising out of the same cause of action between the same parties or their privies, *whether or not* the issues were raised in the first trial." *Faulkner v. GEICO*, 618 A.2d 181, 183 (D.C. 1992) (emphasis added). For res judicata purposes, a " 'cause of action' is determined by the factual nucleus, not the theory on which a plaintiff relies." *Id.* (internal quotation marks omitted). "If there is a common nucleus of facts, then the actions arise out of the same cause of action." *Id.* "In determining whether the two actions arise out of the same cause of action, [courts] consider[] the nature of the two actions and the facts sought to be proved in each one." *Id.* (internal quotation marks omitted). Res judicata serves "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979).

Less familiar in this Circuit is the related doctrine of abstention. *Cf.* John G. Roberts, Jr., *What Makes the D.C. Circuit Different? A Historical View*, 92 Va. L. Rev. 375, 387–88 (2006) (noting the rarity of state law cases in the D.C. Circuit and detailing the creation of the District of Columbia's local court system in the 1970s). Under that doctrine, "a District Court may decline to exercise or postpone the exercise of its jurisdiction." *Allegheny County v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959). But as with many legal concepts, abstention, as this case well illustrates, "is not one doctrine but several." *Adrian Energy Associates v. Michigan Public Service Commission*, 481 F.3d 414, 423 (6th Cir. 2007).

Plaintiffs contend that this case is governed by the abstention principles articulated in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). There, a group of African American porters and the Pullman railroad company brought a constitutional challenge in federal court against a Texas regulation mandating that Pullman sleeping cars always have at least one conductor—which at the time meant a white conductor. The Supreme Court recognized that this complaint "undoubtedly tendered a substantial constitutional issue. . . . It touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." *Id.* at 498. The Court further explained that it would be unnecessary to reach the constitutional question if the Texas Railroad Commission lacked authority under state law to promulgate the challenged regulation. Accordingly, the Court endorsed a "doctrine of abstention" whereby a federal court must withhold ruling on a federal claim so that plaintiffs may obtain a state court ruling on an antecedent state law question. *Id.* at 501. Given preclusion doctrine, *Pullman* abstention raises the question—central to the *Sheptock III* plaintiffs' argument—of how parties compelled to litigate their state law claims in state court can protect their right to return to federal court.

The Supreme Court answered this question in *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411 (1964), where it fashioned a mechanism—known as an *England* reservation—by which parties forced into state court by federal court abstention can reserve their federal claims and avoid the preclusive effect of a state court judgment. The *England* plaintiffs wanted to practice in Louisiana without satisfying the educational requirements of the Louisiana Medical Practice Act. They first brought suit in federal court seeking to have the Act invalidated under the Fourteenth Amendment. Invoking *Pullman* abstention, the federal court

entered an order staying proceedings and retaining jurisdiction pending resolution of a state law question in a Louisiana state court. Plaintiffs then brought suit in state court and "did not restrict those proceedings to the question whether the Medical Practice Act applied to chiropractors. They unreservedly submitted for decision, and briefed and argued, their contention that the Act, if applicable to chiropractors, violated the Fourteenth Amendment." *Id.* at 413 (footnote omitted). After losing both claims in the Louisiana courts, they returned to federal court and the issue of res judicata came to the fore.

In considering this issue, the Supreme Court expressed a "fundamental objection[] to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims." *Id.* at 415 (footnote omitted). The Court also acknowledged that in the "typical" abstention case—"where the state courts are asked to construe a state statute against the backdrop of a federal constitutional challenge," *id.* at 420— plaintiffs may feel compelled to alert the state court to the pending federal challenge to fully argue their case. Indeed, in *Government and Civic Employees Organizing Committee v. Windsor*, 353 U.S. 364 (1957), the Court had required plaintiffs to notify a state court about pending claims in federal court. Thus, to avoid res judicata, the *England* Court instructed plaintiffs to put

> on the state record the reservation to the disposition of the entire case by the state courts . . . . That is, [plaintiff] may inform the state courts that he is exposing his federal claims there only for the purpose of complying with *Windsor*, and that he

> intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions.

*England*, 375 U.S. at 421 (internal quotation marks omitted). In other words, if a party asks a state court not to adjudicate its federal claims because it intends to return to federal court, then it can escape the preclusive effect of a state court judgment. Conversely, "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then . . . he has elected to forgo his right to return to the District Court." *Id.* at 419.

Assuming, as plaintiffs insist, that the district court stayed the case under *Pullman*, the parties contest whether a litigant must first file suit in federal court to obtain an *England* reservation—a question that has sparked a circuit split. *Compare United Parcel Service v. California Public Utilities Commission*, 77 F.3d 1178, 1185 (9th Cir. 1996) ("[W]e decline to limit *England*'s application to cases where the litigant files first in federal court and is remitted to state court pursuant to *Pullman*."), *with Fuller Co. v. Ramon I. Gil, Inc.*, 782 F.2d 306, 312 (1st Cir. 1986) ("In order to make an *England* reservation, a litigant must establish its right to have its federal claims adjudicated in a federal forum by properly invoking the jurisdiction of the federal court in the first instance."). The parties also disagree about whether the Supreme Court's decisions in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), and *San Remo Hotel v. City and County of San Francisco*, 545 U.S. 323 (2005), required the *Sheptock II* plaintiffs to litigate their Takings Clause claim in D.C. Superior Court.

More fundamentally, the District of Columbia disagrees with plaintiffs' contention that the district court stayed the case under *Pullman* abstention principles. According to the District, the court stayed the case pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), which allows a district court to abstain "due to the presence of a concurrent state proceeding." *Id.* at 818. Premised on "reasons of wise judicial administration," *id.*, *Colorado River* abstention "does not rest on a mechanical checklist, but on a careful balancing of . . . important factors." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 16 (1983). These considerations include which court "first assum[ed] jurisdiction over property" involved in the case; "the inconvenience of the federal forum; the desirability of avoiding piecemeal litigation; and the order in which jurisdiction was obtained by the concurrent forums." *Colorado River*, 424 U.S. at 818 (internal citations omitted). As the District sees it, *Colorado River* governs because *Sheptock III* was stayed pending the appeal in *Sheptock II*. An *England* reservation, the District further argues, has no place when a case is stayed pursuant to *Colorado River* abstention.

Fortunately for us, this is not a federal courts exam, and we have no need to pass on all of these arguments. For even assuming that plaintiffs are correct about *Pullman*, their motion to stay failed to qualify as an adequate *England* reservation. In that motion, plaintiffs asked the Superior Court to "stay proceedings on defendant's motion for dismissal or summary judgment . . . pending plaintiffs' submission of federal [antidiscrimination] claims" in federal court. In plain English, plaintiffs asked the Superior Court to stay *all* pending claims, both D.C. *and* federal. This was not an *England* reservation. Under *England*, a party asks the state court to resolve an antecedent state law issue so that it can return to federal court and have its federal claims heard. Here,

by contrast, the *Sheptock II* plaintiffs asked the Superior Court to stay all claims and never signaled a desire to proceed in federal court *after* the Superior Court ruled on any claim, much less an antecedent question of D.C. law.

Reinforcing our view that plaintiffs' motion to stay fails to qualify as an *England* reservation, the parties' briefs on that motion repeatedly frame the issue as one of removal. *See* 28 U.S.C. §§ 1441 & 1446 (removal jurisdiction). In fact, the briefs make no reference at all to *England*. In opposing the motion to stay, the District was uncertain as to what plaintiffs had actually requested of the Superior Court. "It is not clear," the District wondered, "whether plaintiffs seek some sort of bifurcation or removal of claims plaintiffs initiated before this Court." Indeed, the *Sheptock II* plaintiffs took inconsistent and incoherent positions in their reply brief. Although they claimed that they were not seeking removal under 28 U.S.C. § 1441, they nonetheless framed their request as a "removal" of their antidiscrimination claims—claims never formally filed in Superior Court. Plaintiffs also disavowed "removal" of "previously pending claims," which included claims under the Fifth Amendment. On this point, the *Sheptock II* plaintiffs appear to have contradicted their own motion, in which they sought to stay all claims. Given this confusion, it is difficult to ascertain what exactly the *Sheptock II* plaintiffs were seeking in their motion to stay. But what is clear is that plaintiffs *themselves* appear not to have believed they were filing an *England* reservation.

## III.

Plaintiffs acknowledge that absent a valid *England* reservation, Counts I through XII are precluded. *See* Oral Arg. Rec. 6:55–7:40, 16:49–17:05. These counts include the ADA, FHA, D.C. Human Rights Act, and due process claims tied directly to the Franklin Shelter closure.

Plaintiffs insist that Counts XIII through XVIII are not barred by res judicata because they stem from a nucleus of facts distinct from *Sheptock II*. These counts raise race and disability discrimination claims under the ADA and FHA. Although it is not entirely clear from their second amended federal complaint, plaintiffs contend that these counts challenge the District of Columbia's continuing failure to provide housing for the homeless in the wake of the Franklin Shelter closure. Specifically, they point to the District's failure to adequately implement its Permanent Supportive Housing Program. To the extent this program has been implemented, plaintiffs contend that the District has done so in a discriminatory fashion and with the goal of moving the homeless population to the "poorest and most violent parts of town." Second Am. Fed. Compl. ¶ 39. According to plaintiffs, these "post-judgment *events* give rise to new claims, so that claim preclusion is no bar." *Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997); *see also Drake v. FAA*, 291 F.3d 59, 67 (D.C. Cir. 2002) ("The [res judicata] doctrine does not bar a litigant from doing in the present what he had no opportunity to do in the past.").

To recap, res judicata bars a subsequent suit "involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co.*, 439 U.S. at 326 n.5. To ascertain if "two cases implicate the same cause of action" we look to whether "they share the same 'nucleus of facts.' " *Drake*, 291 F.3d at 66 (quoting *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984)).

Contrary to plaintiffs' argument, Counts XIII through XVIII flow directly from the closure of the Franklin Shelter, the same event that formed the basis of *Sheptock II*. The second amended federal complaint's factual allegations repeatedly link the Permanent Supportive Housing Program

and the closure of the Franklin Shelter. For example, the complaint alleges that the harms associated with the Permanent Supportive Housing Program impact "[m]any former residents of Franklin Shelter." Second Am. Fed. Compl. ¶ 42; *see also id.* ¶ 38 ("The Permanent Supportive Housing Program, previously identified by the District as the means to mitigate any loss of shelter space because for [sic] the closing of Franklin Shelter, fails to keep pace with the demand."). The complaint further asserts that the discriminatory provision of services continues because the Franklin Shelter remains closed. "Since the closing of Franklin Shelter," the complaint alleges, "defendants' repeated failures directly and proximately denied plaintiffs needed services." *Id.* ¶ 148; *see also id.* ¶ 117 ("Defendants intentionally denied plaintiffs housing, continued failures [sic] to provide adequate shelter space and placement in permanent supportive housing, because of plaintiffs' race."). Indeed, the requested relief—the reopening of the Franklin Shelter— demonstrates that the allegedly discriminatory provision of services is inextricably tied to the Franklin Shelter closure. *See id.* ¶ 40 ("Plaintiffs seek temporary and permanent injunctive relief compelling the District Government to re-open Franklin Shelter and return the *status quo* . . . .").

To be sure, the events alleged in Counts XIII through XVIII occurred after the Franklin Shelter was closed. But a quick glance at the *Sheptock II* complaint confirms that the events now alleged in *Sheptock III* were known to plaintiffs during the *Sheptock II* litigation. For one thing, the second amended complaint refers to the Permanent Supportive Housing Program's inability to keep up with demand. *See, e.g.*, Second Am. D.C. Compl. ¶ 86 ("It is also unclear what priorities were used to determine placement in the Permanent Supportive Housing Initiative, since the most vulnerable of the Franklin Shelter inhabitants are not currently part of the

program, but are now sleeping in the parks and streets near Franklin Shelter."). The complaint also alludes to the District's alleged policy of moving the homeless population out of the downtown commercial area. *See, e.g.*, *id.* ¶ 80 ("Currently designated warming centers are as many as five miles away from the downtown area . . . ."); *id.* ¶ 84 ("Most placements are occurring in the poorest and most violent parts of town, and with the least services available for the vulnerable and the homeless."). And most significantly, the complaint acknowledges the disproportionate rates of substance abuse and mental illness amongst the city's homeless population—a key premise of the *Sheptock III* plaintiffs' disability discrimination claims. *See id.* ¶ 94 ("In DC, an estimated 71% of the homeless individuals suffer from either substance abuse or mental illnesses.").

Counts XIII through XVIII thus share the same nucleus of facts as *Sheptock II*. True, the *Sheptock II* plaintiffs marshaled these facts in support of constitutional and D.C. law claims, rather than antidiscrimination claims. But res judicata turns on a suit's factual context, "not the theory on which a plaintiff relies." *Faulkner*, 618 A.2d at 183 (internal quotation marks omitted). Because these claims "could have been raised" in *Sheptock II*, they are precluded. *Allen*, 449 U.S. at 94.

## IV.

For the foregoing reasons, we affirm.

*So ordered.*