**DISTRICT UNEMPLOYMENT COMPENSA-
TION BOARD, Appellant,**

v.

**SECURITY STORAGE COMPANY OF
WASHINGTON, a corporation,
et al., Appellees.**

**No. 10114.**

District of Columbia Court of Appeals.

Argued May 18, 1976.

Decided Oct. 21, 1976.

Rehearing en Banc Denied Jan. 11, 1977.

Bill L. Smith, Washington, D. C., with whom George A. Ross, John L. Davis and Robert J. Hallock, Washington, D. C., were on the brief, for appellant.

Gilbert Hahn, Jr., Washington, D. C., for appellees.

Before KERN, GALLAGHER and NE-BEKER, Associate Judges.

KERN, Associate Judge:

The District Unemployment Compensation Board (Board) appeals from the trial court's order which preliminarily enjoined the Board from increasing, as of June 30, 1975, the rate of contribution for unemployment compensation by the appellee-employers during each of the third and fourth quarters of calendar year 1975. The trial court ruled that under the terms of D.C. Code 1973, § 46–303(c)(4)'(B), the Board could not require appellees to make an *immediate* increase in their contribution rate but rather they might defer such increase until the beginning of the calendar year 1976. The Board contends that the trial court's order was improper because it was based on an incorrect reading of the statute.

 The decision to grant a preliminary injunction is within the sound discre-

tion of the trial court,[1] and appellate review of that decision is ordinarily limited "to the issues of whether the trial judge abused his discretion in granting the injunction, or rested his analysis upon an erroneous premise." *A Quaker Action Group v. Hickel*, 137 U.S.App.D.C. 176, 180, 421 F.2d 1111, 1115 (1969). We note at the outset that although there has been no final adjudication in the trial court on the merits of appellees' complaint, which accompanied their motion for preliminary injunction, we deem it appropriate to reach the merits in light of the fact that this case turns entirely on a question of statutory interpretation. As the court in *Delaware & Hudson Railway Co. v. United Transportation Union*, 146 U.S.App.D.C. 142, 159, 450 F.2d 603, 620 (1971) observed:

> Insofar as the action of the trial judge on a request for preliminary injunction rests on a premise as to the pertinent rule of law, that premise is reviewable fully and de novo in the appellate court. The matter stands in a different posture from that involved when there is no question or disagreement as to the legal principle involved, and the element of probability of success on the merits depends on a forecast as to the shape of the facts likely to emerge at trial. *If the appellate court has a view as to the applicable legal principle that is different from that premised by the trial judge, it has a duty to apply the principle which it believes proper and sound.* [Emphasis added.][2]

We further note that while the order issued by the trial court in this case contained the recital that the employers *"will likely* prevail on the merits of their complaint," (emphasis added) a further reading of that order reveals that the trial court has already determined the merits with respect to a crucial element of the appellee-employers' claim, *viz.,* the proper construction of D.C.Code 1973, § 46–303(c)(4)(B).[3] Accordingly, the interests of judicial economy and efficiency would best be served by our full consideration of the merits of the employers' claim pursuant to the proper construction of Section 46–303 (c)(4)(B).

The District of Columbia's Unemployment Compensation Act, D.C.Code 1973, §

---

1. This court has recently enunciated the standard which should guide the trial judge in exercising his discretion as to the propriety of granting a preliminary injunction:

 A proper exercise of discretion requires the trial court to consider whether the moving party has clearly demonstrated: (1) that there is a substantial likelihood he will prevail on the merits; (2) that he is in danger of suffering irreparable harm during the pendency of the action; (3) that more harm will result to him from the denial of the injunction than will result to the defendant from its grant; and in appropriate cases, (4) that the public interest will not be disserved by the issuance of the requested order. [*Wieck v. Sterenbuch*, D.C.App., 350 A.2d 384, 387 (1976).]

2. These principles were applied in *Perry v. Perry*, 88 U.S.App.D.C. 337, 338–39, 190 F.2d 601, 602–03 (1951), where the court reversed a denial of a preliminary injunction based on its disagreement with the trial court's construction of a written agreement.

3. In its Conclusions of Law, the trial court said:

 D.C.Code § 46–303(c)(4)(B) authorizes the Defendant, under certain circumstances, to increase the contribution rate for each plaintiff based upon those certain conditions which may exist as of June 30, 1975, the "computation date". However, such increase in the rate of contribution must take effect and be applied in the ensuing calendar year, in this case, calendar year 1976. The Court concludes that D.C.Code § 46–303(c)(4)(B), § 46–301(8)(c)(i) [*sic,* § 46–301(i)] and DUCB Regulation No. 205.7 require this result.

 The defendant had asserted that it had the right to increase the rate of contribution based upon the June 30, 1975 ("computation date") conditions for the third and fourth quarters of 1975, and proposed to increase rates of contribution to the plaintiffs. The court concludes that this construction is erroneous, based upon D.C. Code § 46–303(c)(4)(B), § 46–301(8)(c) (i) [*sic,* § 46–301(i)] and DUCB Regulation No. 205.7.

46–301, creates an incentive, in the form of permitting contribution rates significantly lower than the standard rate of 2.7% [4] for individual employers to maintain a stable work force and to make voluntary contributions to their separate accounts in the District Unemployment Trust Fund. These lower contribution rates enjoyed by the individual employers who operate in this fashion are not, however, permanently fixed; the Act contains several "emergency" measures by which the contribution rates of these employers will be increased in the event that the amount of the fund decreases to a certain point. The first of these measures provides in pertinent part:

> If the amount of the fund *as of June 30* of any year is less than 4 per centum of the total payrolls subject to contributions under this chapter *for the twelve-consecutive-month period ending on the preceding December 1,* the contribution rate for each employer . . . shall be increased by the percentage differential between said 4 per centum of such total payrolls and said fund's percentage of such total payrolls . . ..[5] [D.C. Code 1973, § 46–303(c)(4)(B); emphasis added.]

The Board reads this provision to mandate an immediate increase in contribution rates so as to make them effective during the third and fourth quarters of any year in which the fund—as of June 30 of that year—has fallen below 4 per cent of the payrolls for the base period, *viz.,* the prior 12-month period ending December 1st. On the other hand, the appellee-employers contend, and the trial court agreed, that § 46–

303(c)(4)(B) constrains the Board from increasing contribution rates until the beginning of the calendar year immediately after the year in which the Board's evaluation of the fund on June 30th takes place.

The trial court's order justified this reading of the statute on two bases: first, by the absence of express authorization in Section 46–303(c)(4)(B) for the Board to increase immediately as of June 30th the rate of contribution, and, second, by reference to the definition of "computation date" contained in Section 46–301(i) of the Act. That section provides in part:

> The term "computation date" means the 30th day of June of each year as of which rates of contributions are determined for the *next following calendar year* . . .. [Emphasis added.]

The trial court apparently reasoned that whenever the Board used June 30th as a "measuring" date, then this particular definitional provision necessarily limited the increases in employers' contribution rates to take effect in the calendar year *next following* the year in which the Board determined the balance of the fund to be inadequate. Put another way, the court seemed to view the term "June 30" as synonymous with the term "computation date" and hence Section 301(i) to apply to Section 303(c)(4)(B).

■ We are of opinion that the statutory provision in question here should be read in light of (a) the overall purpose of the Unemployment Compensation Act and (b) the relationship of Section 46–303(c)(4)(B) to the other "emergency" provision, *viz.,* § 46–303(c)(4)(C).[6] This

**4.** The "standard rate" of contribution, currently set at 2.7% is governed by D.C.Code 1973, § 46–303(c)(3).

**5.** But in no event shall the contribution rate for any employer be greater than the standard rate.

**6.** The appellee-employers have argued that, in the absence of judicial gloss of interpretation

on § 46–303(c)(4)(B), we should look to similar statutes in other jurisdictions and to the interpretation of those statutes by other courts. However, they fail to cite any state statutes, and we have found none, that are sufficiently similar to the section in our Code here in question to be of relevance. Va.Code Ann. § 60.1–85 (1975 Supp.), cited to the trial court by the appellee-employers (R.124), is irrelevant to our inquiry because,

second emergency measure provides in pertinent part:

> If *on December 20 of any year,* the amount in the fund becomes less than 2 per centum of the total annual payrolls subject to contributions under the chapter *for the twelve-consecutive-month period ending on the preceding June 30,* the Board shall make a declaration to that effect. *Effective the quarter following such announcement,* each employer's . . . rate of contribution shall be the standard rate. [D.C.Code 1973, § 46–303(c)(4)(C); emphasis supplied.]

Thus, this statutory section *expressly* provides that the increased contribution rate will become effective within a matter of days, as might be expected of a measure designed "[t]o protect the solvency of the fund." *See* H.R.Rep. No. 232, 78th Cong., 1st Sess. 2 (1943). In our view, Section 46–303(c)(4)(B), the provision here at issue, was also enacted "[t]o protect the solvency of the fund," and if it is to fulfill that legislative purpose it must be allowed to take effect as soon as possible after the Board's determination of the balance in the fund. Certainly there is nothing in the statute itself or in the legislative history which would require delaying its operation for six months in the face of an insolvent fund until the beginning of the next calendar year.[7]

If the interpretation by the appellee-employers were to be adopted,[8] then the stat-ute would be deprived of much of its utility as an emergency provision. Specifically, under § 46–303(c)(4)(B) the balance in the fund is measured on June 30th against the total payroll for the 12 months ending the prior December 1st. If, following this June 30th determination, the increase of the rate of contribution by an employer cannot take effect until the beginning of the next calendar year, there would be a hiatus of more than a year between the measuring period (the 12 months ending the *previous* December 1st) and the date of the rate increase (January through March of the *next* calendar year). We decline to attribute to Congress the intent to enact an emergency provision for increasing the fund yet to employ figures of measurement which are over a year old to redress a decreased balance in that fund. Nor do we think it reasonable that Congress would create two different emergency provisions to respond to deficiencies in the fund at two separate points in time and then dictate that *both* these provisions would take effect at the same time, *viz.,* the beginning of the next calendar year.

A reasonable reading of these two emergency statutory provisions is that they are to operate as progressive remedies which allow the level of the fund to be built up gradually when it becomes intolerably low. At the midpoint of any year, June 30, the fund is measured against the payrolls for the year ending the prior December 1st; if the fund is less tham 4 per cent of the to-

---

unlike § 46–303(c)(4)(B), it expressly provides that increases in contribution rates will become effective "the calendar year following such first day of July." Obviously, the Virginia statute presents no problems of statutory construction in light of this explicit command that the adjustment take place the "following" calendar year.

7. In fact, if anything, the legislative history supports an interpretation of § 46–303(c)(4)(B) which would require immediate increases in rates of contribution rather than delaying those increases until the next calendar year. While the legislative history notes that increases under the companion pro-vision, § 46–303(c)(4)(C) will take effect in "the succeeding calendar year," there is no similar reference in the discussion of § 46–303(c)(4)(B). Rather, the House of Representatives Report simply states that under § 46–303(c)(4)(B), "the contribution for each employer will be increased. . . . " H.R.Rep.No.232, 78th Cong., 1st Sess. 2 (1943).

8. The Board's Regulation § 205.7 does not support the particular construction appellees urge we give the statute since that Regulation employs the term "computation *date*" which is absent from Section 46–303(c)(4)(B).

tal payrolls, then the contribution rate for individual employers is *at that time* increased in varying degrees, depending on the amount of the deficiency. Such a gradual and flexible increase in rates is clearly designed to alleviate *short-term* deficiencies in the fund without completely eradicating the system of employer incentive based on lower contribution rates. If, however, at approximately the conclusion of the year, *viz.*, December 20, the fund continues to be deficient and stands at less than 2 per cent of the total payrolls for the year ending June 30, then a more drastic remedy is needed and prescribed. After a declaration by the Board of such a deficiency, the system of lower contribution rates is scrapped and each employer's contribution rate for the very next quarter returns to the "standard rate" of 2.7%.

■ We are not persuaded, as was the trial court, that Section 46–301(i), which defines the term "computation date", compels a reading of Section 46–303(c)(4)(B) contrary to that urged by the Board. Preliminarily, we observe that the very term "computation date" is *not* contained in § 46–303(c)(4)(B); rather, the term "June 30" is employed in that statute. Indeed, an earlier version of § 46–303(c)(4)(B), which Congress amended, did contain the phrase "computation date" instead of an express date, such as June 30th. In 1971, Congress amended the section to its present form, Act of Dec. 22, 1971, Pub.L. 92–211, § 2(17), 85 Stat. 760–762, and we may properly infer from this amendment the legislative intent that § 46–303(c)(4)(B) be read without reference to the definitional provisions of § 46–301(i).

■ Furthermore, we believe our reading of § 46–303(c)(4)(B) to be consistent with established principles of statutory construction of taxing statutes; *viz.*, permitting employers to make lower contribution rates constitutes an exemption from the standard contribution rate, and, like any tax exemption, the privilege of paying lower rates must be strictly construed against the tax-paying employer and in favor of the taxing authority.[9] The matter was succinctly phrased by the federal circuit court here in *National Rifle Association v. Young*, 77 U.S.App.D.C. 290, 291, 134 F.2d 524, 525 (1943):

> Compulsory unemployment contributions are taxes. Exemptions from taxation in general, and from this sort of taxation in particular, are strictly construed.

The rule of strict construction was expressed even more strongly by the court in *Washington Chapter of American Institute of Banking v. District of Columbia*, 92 U.S.App.D.C. 139, 141, 203 F.2d 68, 70 (1953), quoting 2 Cooley, The Law of Taxation § 672 at 1403:

> "An intention on the part of the legislature to grant an exemption from the taxing power of the state will never be implied from language which will admit of any other reasonable construction. Such an intention must be expressed in clear and unmistakable terms, or must appear by necessary implication from the language used . . . ."

Such strict construction of exemptions granted under the Unemployment Compensation Act is necessary to fulfill its

---

9. The appellee-employers have cited us to authority from another jurisdiction to the effect that taxing statutes are strictly construed against the state. *See Texas v. The Praetorians*, 143 Tex. 565, 186 S.W.2d 973 (1945). However, the rule in this jurisdiction is to the contrary. *See Conference of Major Religious Superiors of Women, Inc.* *v. District of Columbia*, 121 U.S.App.D.C. 171, 348 F.2d 783 (1965); *Hebrew Home for the Aged v. District of Columbia*, 79 U.S.App.D.C. 64, 142 F.2d 573 (1944); *Combined Congregations of District of Columbia v. Dent*, 78 U.S.App.D.C. 254, 140 F.2d 9 (1943).

statutory purpose which is "to protect employees against economic dependency caused by temporary unemployment and to reduce the necessity of relief or other welfare programs." *Von Stauffenberg v. District Unemployment Compensation Board,* D.C.App., 269 A.2d 110, 111 (1970), aff'd. 148 U.S.App.D.C. 104, 107, 459 F.2d 1128, 1131 (1972).

Accordingly, we conclude that the trial court erred in construing Section 46-303(c)(4)(B) to permit appellee-employers to defer increase of contributions to the beginning of calendar year 1976 and the Board's construction of the statute requiring increases in the the third and fourth quarters of calendar year 1975 was correct.

*Reversed.*