*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-292

DISTRICT OF COLUMBIA, APPELLANT,

V.

MELVERN REID, *et al.*, APPELLEES.

Appeal from the Superior Court of the District of Columbia
(CAB-1238-14)

(Hon. Robert D. Okun, Trial Judge)

(Argued September 26, 2014　　　　　　　Decided December 18, 2014)

*Loren L. AliKhan*, Deputy Solicitor General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Stacy L. Anderson*, Senior Assistant Attorney General, were on the brief, for appellant.

*Allison M. Holt*, with whom *Jonathan L. Abram* and *Jennifer D. Brechbill* were on the brief, for appellees.

*Amber W. Harding* filed a brief on behalf of the Washington Legal Clinic for the Homeless, Bread for the City, Children's Law Center, D.C. Fiscal Policy Institute, District Alliance for Safe Housing, Fair Budget Coalition, Good Faith Communities, Homeless Children's Playtime Project, the Legal Aid Society of the District of Columbia, Miriam's Kitchen, National Alliance to End Homelessness, National Association for the Education of Homeless Children and Youth, National Center on Housing and Child Welfare, National Coalition for the Homeless, National Law Center on Homelessness and Poverty, Sasha Bruce Youthwork, and

Professors Robert D. Dinerstein, Deborah Epstein, Matthew Fraidin, Jeffrey Gutman, Ann Shalleck, and Jessica Steinberg.


Before BLACKBURNE-RIGSBY AND EASTERLY, *Associate Judges*, and EPSTEIN, *Associate Judge of the Superior Court of the District of Columbia.*[*]


EASTERLY, *Associate Judge*: For almost as long as it has had a statutory obligation to provide shelter to the homeless, the District has been prohibited from placing homeless families in congregate shelters. This prohibition, dating back to 1988, is premised on an understanding that families have special needs that are best served by affording them apartment-style shelter—i.e., housing units with cooking facilities, bathroom facilities, and sleeping quarters—although with the recent amendment of the Homeless Services Reform Act (HSRA),[1] the District is now permitted to place families in private rooms if apartment-style shelter is unavailable.[2]


This case arises from an attempt by homeless families to hold the District to its undisputed legal obligations, after the Department of Human Services (DHS), in

---

[*] Judge Epstein is sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

[1] D.C. Code § 4-751.01 *et seq.* (2012 Repl.).

[2] D.C. Code. § 4-753.01 (d) (2012 Repl.).

the winter of 2013-2014, began housing families in partitioned spaces within communal recreation centers. Concerned, among other things, about safety, privacy, and hygiene, a group of families sued on behalf of themselves and others similarly situated. They sought and obtained preliminary injunctive relief requiring the District to, *inter alia*, place them in apartment-style or private room shelter "on any night in which the actual or forecasted temperature, including the windchill factor, falls below 32 degrees Fahrenheit." The District now appeals.

The District's primary argument is that the trial court should not have issued a preliminary injunction because the plaintiff families are unlikely to succeed on the merits. The District does not dispute that it has a statutory obligation to place homeless families in apartment-style or private room shelter. Instead, the District argues only that the plaintiff families have no right under D.C Code § 4-755.01 (a) (2012 Repl.) to sue the District to enforce the law.

The District acknowledges that, with the passage of the HSRA, the Council of the District of Columbia created an entitlement to, and thereby authorized a private right of action to enforce, "shelter in severe weather conditions."[3] But the

---

[3] *See* D.C. Code. § 4-755.01 (a).

District asserts that this entitlement to sue for severe weather shelter is not coextensive with the District's statutory obligation to provide apartment-style or a private room shelter for homeless families, and instead merely authorizes a private right of action to obtain something less than the statute requires the District to give. In this case, the District asserts that the statutory entitlement to sue for severe weather shelter allows families to sue for nothing more than four walls and a roof.

Reviewing the relevant provisions of the HSRA de novo, we disagree with the District's interpretation of the statute. Preliminarily, we disagree that the meaning of the entitlement-to-sue provision plainly precluded the homeless families' suit. Moreover, from our review of the statute as a whole and its legislative history, we conclude that the plaintiff families were empowered to sue in severe weather for the full measure of the statutory protections afforded them— protections which are an integral part of the Council's continuing effort to ensure the health, safety, and welfare of homeless families in the District. Accordingly, the plaintiff families have demonstrated the requisite likelihood of success on the merits.

We are unpersuaded by the District's additional attacks on the Superior Court's decision to issue a preliminary injunction in this case. We discern no error

in the Superior Court's adherence to our four-factor test for the issuance of a preliminary injunction and refusal to consider the District's purported inability to comply with the sought-after injunction. We see no abuse of discretion in the trial court's admission of expert testimony or error in its assessment of the sufficiency of the evidence of irreparable harm. Thus, we affirm.

## I.  Facts and Procedural History

Each year, the District of Columbia's Interagency Council on Homelessness (ICH) is required to develop the annual Winter Plan.[4]  The Winter Plan "determines the projected shelter capacity that will be needed to meet the demand for shelter by individuals and families throughout the upcoming winter."[5]  The

---

[4]  The ICH is composed of a cross-section of citizens and government officials, including the City Administrator, heads of various District agencies and departments, representatives from private and nonprofit organizations, homeless individuals and homeless persons' advocates, as well as members of the Council of the District of Columbia.  D.C. Code § 4-752.01 (b) (2012 Repl.).

[5]  *See* Corrected Declaration of Michele Williams, DHS Administrator of the Family Services Administration at 2, Mar. 4, 2014.

annual "Winter Plan is based on past experience, current data, and the estimation of the ICH members."[6]

During the winter of 2011-2012, DHS placed approximately 560 families in shelter. During the following winter of 2012-2013, there was a twenty-percent drop in placements and DHS placed only 463 families in shelter. Based on the 2012-2013 data, some ICH members argued that the ICH should plan for even fewer than 463 family placements in the winter of 2013-2014. DHS and others opposed this reduction and advocated for a 10% increase, for a total of 509 projected placements. The number endorsed by DHS was incorporated into the ICH's approved Winter Plan for 2013-2014.

The ICH did not accurately anticipate the need for shelter for families during the winter of 2013-2014. By November 1, 2013, all of the District's 121 apartment-style shelters were occupied.[7] At that point, the District began placing

---

[6] *Id.*

[7] The D.C. General Shelter, which has space for 288 families, reached capacity by mid-December 2013. The placement of families at D.C. General is not at issue in this litigation.

families in hotel rooms. By January 30, 2014, DHS had made over 700 new placements into shelter or hotel rooms—far exceeding the ICH's projected number of new family placements for the entire winter season.

The District had informal arrangements with approximately six to eight hotels to accept family placements. But it had not negotiated any sort of written agreement for the District to rent "a certain number of rooms or to make any number of rooms available," and these hotels did not provide enough rooms to meet the District's needs. The District attempted to identify other family placements by having a staff member make daily telephone calls to hotels identified though "a lead" or a search "through the yellow pages or Google." When this strategy proved insufficient and demand for shelter did not abate, DHS opened the Benning Park Recreation Center and the King Greenleaf Recreation Center to accommodate additional homeless families.

At the recreation centers, homeless families with minor children slept on cots in "auditoriums or gyms." Initially, families were separated from strangers only by portable Red Cross partitions made of flimsy material and which had gaps at the corners, providing little privacy. The District later supplemented the Red

Cross partitions with sturdier partitions that were taller and had fewer gaps.[8] But these new partitions still did not lock from the inside, and thus provided families with no security from the various people—including cleaning staff, shelter staff, and others seeking shelter—who walked about the communal sleeping area throughout the night. Moreover, the partitions did not shield families from the noise of other people talking, singing, and playing basketball, or from the smells of alcohol and cigarette and marijuana smoke, or from the overhead lights, which, although dimmed, were kept on all night for security reasons. And families had to venture outside the partitions to use communal restrooms (and in one instance, to get access to an electrical outlet for a child's nebulizer). The shared restrooms were unsanitary, in constant use, and had no bathing facilities available for families to use.

---

[8] The District installed these new partitions after the commencement of separate litigation in February 2014, with the Office of Administrative Hearings (OAH), in which the petitioner families asserted that their placement the Benning Park Recreation Center was unlawful. OAH concluded that DHS had not provided petitioners with an apartment-style shelter or private rooms and had thereby violated petitioners' rights. *See Goggins v. Comm. Partnership for the Prevention of Homelessness*, Case No. 2014-SHEL-00040, Feb. 24, 2014 (final order) *and Garrett v. Comm. Partnership for the Prevention of Homelessness*, Case No. 2014-SHEL-00050, Feb. 24, 2014 (final order).

Several homeless families who were placed at the recreation centers during hypothermic weather conditions filed suit in February 2014, seeking a declaration that the District had violated the HSRA by placing them in congregate shelters, and an award of damages. On the same day they filed their complaint, the plaintiff families filed a motion for a temporary restraining order and a motion for a preliminary injunction preventing the District from placing families in "communal rooms, separated only by portable partitions without a door," and ordering the District to "[p]lace eligible homeless families in an apartment-style shelter, or, if none are available, in a private room." The Superior Court, Judge Tignor presiding, issued a TRO, reasoning that "the entitlement to shelter includes entitlement to the type of shelter prescribed in § 4-753.01 (d)," the apartment-style shelter or private room requirement for homeless families.[9]

Shortly thereafter, the Superior Court, Judge Okun presiding, held a hearing on the plaintiff families' motion for a preliminary injunction.[10] To make its ruling,

---

[9] Coincidentally, Judge Tignor had presided over a similar case, *Walls v. Barry*, filed by families placed in congregate shelters in the winter of 1988, and also granted those families a TRO. *See infra* notes 33 to 35 and accompanying text.

[10] In addition to hearing evidence on the preliminary injunction, the Superior Court granted conditional class certification pursuant to Super. Ct. Civ. R. 23 (b)(2) and (c)(1). The class was conditionally certified to include "any

(continued…)

the court employed the four-factor test for whether a preliminary injunction should issue: (1) whether there is a substantial likelihood that the movants will prevail on the merits; (2) whether they are in danger of suffering irreparable harm during the pendency of the action if the injunction is not granted; (3) whether the balance of the equities is in their favor; and (4) whether the public interest would be disserved by the issuance of an injunction.[11] The Court determined that all four factors favored the issuance of an injunction.

---

(…continued)

homeless family that has been placed in severe weather shelter, if that shelter did not consist of apartment-style shelter or a private room, during this winter season," excluding families that had been placed at the District of Columbia General Shelter, and "all present and future homeless families that reside in the District, who qualify for and need or will need emergency shelter during hypothermic conditions."

[11] *See Wieck v. Sterenbuch*, 350 A.2d 384, 387 (D.C. 1976). The Superior Court rejected the District's argument that it should also consider the District's asserted inability to comply with the sought-after injunction. The court determined that this was "not a reason that [it] should deny relief to the plaintiffs when the plaintiffs have clearly established that they are entitled to injunctive relief," and explained that this was an issue that the District could raise later "if, and only if, the plaintiffs seek to hold the District in [c]ontempt for any failure to comply" with the court's order.

Regarding the likelihood of success on the merits, the Superior Court analyzed the HSRA[12] and determined that the plaintiff families were both entitled to apartment-style or private room shelter and authorized to sue to enforce this entitlement on hypothermic nights (nights when the temperature falls below 32 degrees Fahrenheit). With respect to the risk of irreparable harm, the Superior Court considered the "generalized" testimony by District's witnesses about the District's effort to provide shelter to the plaintiff families, and determined that it both was "generally credible" and reflected that the District was acting in good faith. Nevertheless, the court concluded that the plaintiff families had presented more specific, "powerful[,] and compelling testimony" "about the type of harm that has been suffered by homeless families placed in the rec centers," and in particular the "psychological harm . . . [to] one of the most vulnerable segments of our population, the children of homeless families." Accordingly, the trial court granted the request for a preliminary injunction and directed the District, on

---

[12] The Superior Court did not incorporate into its analysis DHS's definition of the previously undefined term "private room," which DHS had adopted via emergency rule-making three days before the hearing on the plaintiff families' motion for a TRO. In this new rule, DHS defined "private room" as "a part of the inside of a building that is separated by walls or partitions for use by an individual or family." *See* 61 D.C. Reg. 2262 (Mar. 14, 2014). The Superior Court declined to give any deference to this definition as it "appear[ed] to have been adopted in response to this litigation." The District has not challenged this ruling on appeal.

hypothermic nights, to place the plaintiff families in apartment-style shelters or private rooms.[13]  This appeal followed.

## II.    Standard of Review

Where the trial court has issued a preliminary injunction, this court's review is circumscribed.  We defer to the trial court's findings of fact so long as they are sufficiently supported by the record, and having confirmed that the trial court's "analysis reflects a resolution of all the issues which necessarily underlie the issuance of an injunction," we leave the decision to grant or deny preliminary injunctive relief to the sound discretion of the trial court.  *See District of Columbia v. Group Ins. Admin.*, 633 A.2d 2, 22 (D.C. 1993) (quoting *Wieck*, 350 A.2d at 387).  In general, "our role . . . is not to resolve the merits of the underlying dispute between the litigants."  *Group Ins. Admin.*, 633 A.2d at 22.  This general rule is

---

[13] The order also provided that each apartment-style shelter or private room should have "1. Four non-portable walls, a ceiling, and a floor that meet at the edges, and each wall so provided shall be continuous and uninterrupted except that it may contain a window, and that any window so provided must be capable of shutting and come provided with an opaque window covering such as blinds or shades; and 2. A door that locks from within as its main point of access; and 3. Sufficient insulation from sound so that family members sheltered within may have a conversation at normal conversational level and not be heard from without; and 4. Independent lighting that the occupants can turn on or off as desired."

subject to an exception: where "the action of the trial court turns on a question of law or statutory interpretation." *Id.* As to those questions, our review is de novo. *See District of Columbia v. Sierra Club*, 670 A.2d 354, 361 (D.C. 1996); *District Unemp't Comp. Bd. v. Sec. Storage Co. of Wash.*, 365 A.2d 785, 787 (D.C. 1976).

## III.   Analysis

The District has challenged the Superior Court's order granting the plaintiff families an injunction on three grounds. First, the District argues that the court misinterpreted the HSRA and thus miscalculated the plaintiff families' likelihood of success on the merits. Second, the District argues that the court should have considered, in addition to the traditional preliminary injunction factors, the District's asserted inability to comply with the requested injunction. Third, the District argues that the court miscalculated the likelihood of irreparable harm. We address each argument in turn.

### A.      Likelihood of Success on the Merits.

Whether the plaintiff families are likely to succeed on the merits does not turn on an assessment of the District's legal obligations. The District does not dispute that it is statutorily required to provide homeless families with apartment-style shelter or private rooms at all times, including in hypothermic conditions.[14] Instead, the likelihood that the plaintiff families will succeed in their action turns solely on whether they can claim a statutory entitlement to sue under § 4-755.01 (a) to enforce the District's undisputed obligations. Simply put, the question is whether the plaintiff families can sue the District in severe weather to make it follow the law.

### 1. Textual Analysis

"The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc).

---

[14] This requirement is phrased as an unqualified prohibition: "[T]he Mayor shall not place homeless families in non-apartment-style shelters," and "is authorized to place homeless families in non-apartment-style shelters that are private rooms only when no apartment-style shelters are available." D.C. Code § 4-753.01 (d). *See also* D.C. Code § 4-751.01 (3) (2012 Repl.) (defining "apartment style").

Thus, we begin our analysis by "look[ing] at the language of the statute by itself to see if the language is plain and admits of no more than one meaning." *Id.* The first obviously relevant section of the HSRA is D.C. Code § 4-755.01 (a), which addresses and restricts the entitlement to sue. It states that, "[n]o provision of this chapter shall be construed to create an entitlement (either direct or implied) on the part of any individual or family to any services within the Continuum of Care, other than shelter in severe weather conditions as authorized by § 4-754.11 (5)." Section 4-754.11 (5) (2012 Repl.) affirmatively states that "[c]lients served within the Continuum of Care shall have the right to . . . shelter in severe weather conditions."

Having proceeded thus far with our examination of the HSRA, it is still unclear from the statute's plain language what sort of shelter homeless families are entitled to sue for in severe weather. The District, however, urges us to continue on to the definitions contained in the HSRA, D.C. Code § 4-751.01 (2012 Repl.), for "severe weather conditions" and "shelter," and there to end our analysis. Looking to those definitions, we see that "severe weather conditions" is defined as "the outdoor conditions whenever the actual or forecasted temperature, including the wind chill factor or heat index, falls below 32 degrees Fahrenheit or rises above

95 degrees Fahrenheit."[15]  "Shelter" is defined as "severe weather shelter, low barrier shelter, and temporary shelter."[16]  "Severe weather shelter" is in turn defined as "hyperthermia shelter or hypothermia shelter."[17]  Finally, "hypothermia shelter" is defined as "a public or private building that the District shall make available, for the purpose of providing shelter to individuals or families who are homeless and cannot access other shelter," when the actual or forecasted temperature falls below 32 degrees Fahrenheit.[18]

Tracing this narrow path through the statute, the District argues that, for homeless families, the entitlement to sue for severe weather shelter reduces to nothing more than an entitlement to sue to obtain shelter in "a public or private building"—four walls and a roof, nothing more.  In other words, according to the District, the plain language entitlement to sue for severe weather shelter (i.e., shelter provided when it is either very hot or very cold outside) does not entitle a homeless family to sue for shelter that is either cooled or heated, as the case may

---

[15]  D.C. Code § 4-751.01 (35) (2012 Repl.).

[16]  D.C. Code § 4-751.01 (37) (2012 Repl.).

[17]  D.C. Code § 4-751.01 (36) (2012 Repl.).

[18]  D.C. Code § 4-751.01 (21) (2012 Repl.).

be, to give respite from the severe weather. This makes no sense, and it would render the entitlement to sue an empty one. We decline to read the entitlement provision in this manner.[19] *See United States v. Brown*, 333 U.S. 18, 27 (1948) ("No rule of [statutory] construction necessitates our acceptance of an interpretation resulting in patently absurd consequences."); *see also Abdulshakur v. District of Columbia*, 589 A.2d 1258, 1266 (D.C. 1991) ("Courts avoid interpretations of statutes which lead to implausible results.").

Reversing out of the District's analytic dead-end, we broaden our inquiry to examine the statute as a whole, pertinent case law, and the legislative history of the HSRA. As we have previously observed, "[s]tatutory interpretation is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *Baltimore v. District of Columbia*, 10 A.3d 1141, 1146 (D.C. 2011). Moreover, not only is there "wisely no rule of law forbidding resort to explanatory legislative history no matter how

---

[19] The District contends that it is "not seeking judicial authorization to place families in unsafe shelters or in derelict buildings with no heat, power or toilet facilities." But the District's good intentions are beside the point. The question is whether the entitlement set forth in § 4-755.01 (a) allows suit to force the District to provide homeless families with anything beyond the shell of "a public or private building."

clear the words may appear on superficial examination," *id.*, where, as here, the literal words of some portion of the statue "would bring about a result completely at a variance with the purpose of the act," it is "proper" to consider the statute's legislative history. *Dyer v. D.C. Dep't of Hous. & Cmty Dev.,* 452 A.2d 968, 969-70 (D.C. 1982). Ultimately, "our task is to search for an interpretation that makes sense of the statue as a whole," and we "turn to legislative history to determine whether our interpretation is consistent with legislative intent." *Cass v. District of Columbia*, 829 A.2d 480, 482 (D.C. 2003).

Beyond the statutory definitions cited by the District, there are other provisions of the HSRA that inform our analysis of the severe weather shelter entitlement to sue in D.C. Code § 4-755.01 (a). As discussed above, § 4-755.01 (a) references § 4-754.11 (5), and that provision in turn guarantees severe weather shelter to "[c]lients served within the Continuum of Care." The Continuum of Care is defined as the "comprehensive range of services . . . designed to meet the specific, assessed needs of individuals and families who are homeless or at imminent risk of becoming homeless." D.C. Code § 4-753.01 (a) (2012 Repl.). Section 4-753.01 (b) generally describes the services that the District "may" make

available to eligible[20] homeless individuals and families.[21]  But sections 4-753.01 (c) and (d) are mandatory; they set forth services that the District "shall" provide.[22]

Subsection (c) requires that the District "shall" provide severe weather shelter[23] to homeless District residents (it "may" make severe weather shelter available to homeless non-residents as well) and requires the District to locate that shelter in "appropriate space."[24]  Subsection (d) sets forth the requirement that the

---

[20]  D.C. Code § 4-753.02 (2012 Repl.).

[21]  These services include crisis intervention, outreach and assessment, different varieties of shelter, longer-term housing support, permanent supportive housing, employment assistance, physical and mental healthcare, transportation, substance abuse recovery, child care, case management, and other health and social service needs.  *Id.*

[22]  *See Fountain v. Kelly*, 630 A.2d 684, 686 n. 3 (D.C. 1993) ("This court has repeatedly held that, in the absence of unusual circumstances, the word 'shall' is mandatory."); *cf. Baltimore*, 10 A.3d at 1151 ("shall" has its ordinary mandatory meeting unless context demonstrates otherwise).

[23] Subsection (c) does not actually use the term "severe weather shelter" but it describes conditions that would constitute "severe weather" under the definitions provided in D.C. Code §4-751.01.  *See infra* n. 24.

[24]  D.C. Code § 4-753.01 (c)(1) (2012 Repl.) ("Whenever the actual or forecasted temperature, including the wind chill factor, falls below 32 degrees Fahrenheit, or whenever the actual or forecasted temperature or heat index rises above 95 degrees Fahrenheit, the District shall make available appropriate space in District of Columbia public or private buildings and facilities for any resident of the District who is homeless and cannot access other housing arrangements.  The district may make such space available for any person who is not a resident of the

(continued…)

District "shall" place homeless families in apartment-style shelters and authorizes alternative placement in private rooms "only when no apartment-style shelters are available." D.C. Code § 4-753.01 (d); *see supra* note 14.

This court has previously looked to the Continuum of Care provisions to assess the entitlement to sue under D.C. Code § 4-755.01 (a). In *Baltimore v. District of Columbia*, this court considered whether a group of adult homeless men could sue to stop the District from closing the Franklin Shelter. 10 A.3d at 1147. We concluded that the plaintiffs did not have a right to sue to keep a particular shelter operational, and that the only entitlement to sue under the statute was to obtain severe weather shelter. But in so doing, we recognized that, "[b]ecause there are potential ambiguities in the sections of the HSRA which pertain to services for the homeless, we must construe several provisions together . . . and reconcile them in order to determine what, if any, services mentioned in the HSRA constitute statutory entitlements." *Id.* at 1151.

---

(…continued)
District, is homeless, and cannot access other housing arrangements; provided, that the District shall give priority to residents of the District."). Subsection (c)(2) restricts the District from using D.C. Public Schools buildings "currently being used for educational purposes without the prior approval of the Mayor." D.C. Code § 4-753.01 (c)(2) (2012 Repl.).

Accordingly, the court in *Baltimore* looked not just to the entitlement-to-sue provision in D.C. Code § 4-755.01 (a), but also to the mandatory Continuum of Care provision in D.C. Code § 4-753.01 (c). We explained that, for the plaintiffs in that case, adult homeless men, "there is one clear statutory entitlement embodied in § 4-753.01 (c), and that is the right to 'appropriate space in District of Columbia public or private buildings and facilities' for a homeless person 'who cannot access other shelter'" in severe weather. 10 A.3d at 1150.

This court's determination in *Baltimore* that the entitlement to sue under § 4-755.01 (a) is "embodied" in part in D.C. Code § 4-753.01 (c) informs our analysis in this case of § 4-753.01 (d) as another of the District's mandatory Continuum of Care obligations.[25] It demonstrates that the substance of the entitlement to sue in severe weather is not confined to §§ 4-755.01 (a), 4-754.11 (5), and the definitional sections of the HSRA, but rather can also be located within the mandatory Continuum of Care provisions to which § 4-754.11 (5) directs us. In *Baltimore*, we

---

[25] On appeal, the District asserted that all references to § 4-753.01 (c) in *Baltimore* were dicta and disavowed any reliance on our decision in that case. Before the Superior Court, however, the District argued that, "[t]he *Baltimore* case controls here," and that its holding "is dispositive." Between the District's varying positions, we take a middle road. As we explain, *Baltimore* does not so much dictate our holding as give us helpful guidance in the proper interpretation of the entitlement-to-sue provision of the HSRA.

looked to § 4-753.01 (c) to give meaning to the entitlement-to-sue provision because of its mandatory language for the care of all homeless residents of the District (individuals and families) in severe weather. We look now to subsection (d) because it is also a, "shall" provision that applies to homeless families at all times, not least in severe weather. Indeed, inasmuch as § 4-751.01 (37) defines "shelter" in part as "severe weather shelter," § 4-753.01 (d)(1) can be read to explicitly prohibit the Mayor from placing homeless families in "non-apartment-style [severe weather shelter]."

Moreover, because all the District's homeless residents have an entitlement to sue under § 4-755.01 (a) to ensure that they are provided severe weather shelter in "appropriate space" as required under § 4-753.01 (c), it rationally follows that homeless families seeking severe weather shelter have an entitlement to sue to ensure they are given apartment-style or private room shelter as required under § 4-753.01 (d). Simply put, the Council has determined that such shelter is the only "appropriate space" for families.

In an effort to disprove that the Council meant to create an entitlement for homeless families to sue for apartment-style or private room shelter in severe

weather, the District calls our attention to other sections of HSRA.[26]  These provisions do not sway our analysis.  For example, the District looks to the permissive language in § 4-753.01 (b)(3)(A) (outlining the range of services that may be provided within the Continuum of Care, *see supra* n. 21) and asserts that the HSRA "couches the provision of all shelter . . . in permissive, rather than mandatory, terms."  But the general permissive language of § 4-753.01 (b) does not trump the mandatory language of § 4-753.01 (c) & (d) discussed above.

The District also calls our attention to the standards for providers of severe weather shelter set forth in § 4-754.22, noting that these standards require the provision of many things—properly functioning heating and cooling systems, functioning toilets, beds with clean linens—but not apartment-style shelter.  That

---

[26] On appeal, the District argues for the first time that the entitlement-to-sue provision cannot encompass apartment-style shelter because that would entitle homeless families to sue to obtain apartment-style shelter under hyperthermic conditions (when the actual or forecasted temperature or heat index rises above 95 degrees Fahrenheit, *see* D.C. Code § 4-751.01 (20) (2012 Repl.) (defining "hyperthermia shelter"); *see also* D.C. Code § 4-751.01 (36) (defining "severe weather shelter" to include "hyperthermia shelter")).  The District asserts that this is an unreasonable result, but we do not find it at all unreasonable to think that the Council would recognize that, on extraordinarily hot days as on extraordinarily cold nights, families require apartment-style or at a minimum private room shelter and that they should be able to sue to force the District to provide them with this needed shelter.

§ 4-754.22 does not include apartment-style shelter as a standard is unsurprising, since these standards apply to providers of severe weather shelter for both homeless individuals (whom the District need not house in apartment-style shelter) and homeless families. In any event, the District's obligation to place homeless families in apartment-style shelter or private rooms under § 4-753.01 (d) precludes the District from providing less (or contracting with organizations who would provide less).[27]

---

[27] The District also notes that administrative review under D.C. Code § 4-754.41 is not available to obtain the Continuum of Care services offered under § 4-753.01 and only gives homeless individuals or families the option of "request[ing] a fair hearing to . . . [o]btain any legally available and practical remedy for any alleged violation of . . . [t]he client rights listed in [§ 4-754.11]." *See* D.C. Code § 4-754.41 (b)(3)(B) (2012 Repl.). Whether optional administrative review is available in addition to judicial review is beside the point in this case, but in light of this court's decision in *Baltimore* and our analysis above, we are hard-pressed to understand why a homeless family could not seek administrative review of the denial of severe weather shelter that incorporates the mandatory provisions of the Continuum of Care under D.C. Code §§ 4-753.01 (c) & (d). And the record reflects that at least two families have sought and obtained relief in administrative proceedings. *See supra* note 8.

*2. Legislative History*

The legislative history of the HSRA and its recent amendment in 2010 provide additional support for our understanding that the entitlement to sue for severe weather shelter under § 4-755.01 (a) tracks the District's obligation to provide homeless families with apartment-style shelter under § 4-753.01 (d).

First, the District's obligation to provide homeless families with apartment-style shelter, reaffirmed in the HSRA, must be placed in historical context. At the time the HSRA was enacted, this obligation was neither new nor disputed. Indeed it had been in place since 1988 and was born of the District's failure to provide adequate shelter to families in hypothermia season, the time when District faces the greatest demand for shelter for the homeless.

In December of 1986, the number of homeless families seeking emergency shelter skyrocketed, increasing by "roughly 500 percent."[28] "[A] great number of

---

[28] D.C. Council, Comm. on Human Servs., Report on Bill 7-224 at 2 (Jul. 7, 1987).

those persons belonging to this new class of homeless persons [were] children."[29] At a February 1987 hearing on the District's emergency shelter programs, the D.C. Council was put on notice of conditions homeless families faced in congregate shelters. The Committee on Human Services heard "witness after witness" testify to the "negative impact of children residing in temporary shelters."[30] Seeking to address the distinct needs of homeless families with children, the Council passed the Emergency Shelter Services for Families Reform Amendment Act of 1987 (Emergency Shelter Act), which first set forth the requirement that homeless families be housed in apartment-style shelters.[31]

---

[29] *Id.* at 2-3.

[30] *Id.* at 2-3.

[31] The Act required the Mayor to "establish and maintain" a "sufficient number of emergency shelter family housing units for homeless families with minor children." D.C. Code § 3-206.3 (b)(1) (1988), *recodified at* D.C. Code § 4-206.03 (b)(1) (2001), *repealed by* Homeless Services Reform Act, D.C. Law No. 16-35 § 32 (d). It also required each unit to be "apartment-style housing" equipped with separate cooking facilities, private bathroom facilities, separate sleeping quarters for adults and children, and immediate outdoor areas for use of the minor children for exercise and play. *Id.* The Act limited the authority of the District to house homeless families in spaces, such as hotel rooms, that lacked those amenities: "[T]he Mayor shall not place a homeless family with minor children in a hotel, motel, or other similar shelter unless: (1) Unforeseen circumstances leave no acceptable alternative . . . and (2) The placement is for no longer than 15 calendar days." *See* D.C. Code § 3-206.3 (g) (1988), *recodified at* D.C. Code § 4-206.03 (g) (2001), *repealed by* Homeless Services Reform Act § 32 (d).

This obligation was reinforced in 1988 when the District discovered that the 500 beds it had made available for homeless families were insufficient and another shelter crisis arose.[32] On January 5, 1988, the Council, "reacting to the shortage of shelter space [and] plummeting temperatures," passed emergency legislation authorizing the mayor to house homeless residents overnight in the D.C. Armory, RFK Stadium, and the Washington Convention Center.[33] The Council opened the District Building to the homeless, and then-Mayor Marion Barry authorized use of the Randall School gymnasium as an emergency shelter.[34] Once again, reports of unhealthy conditions emerged. "Besides the fact that there was no privacy for shelter residents, babies slept on cots and mothers bathed their babies in a single wash basin. There was also constant noise and a host of other problems."[35] The Council responded to these reports with permanent legislation providing that "[t]he Mayor shall not place homeless families in congregate shelters."[36]

---

[32] *See* Athelia Knight, *Council Opens Doors to Homeless*, WASH. POST, Jan. 6, 1988, at A14, *reprinted in* D.C. Council, Comm. on Human Servs., Report on Bill 7-401 (Oct. 6, 1988).

[33] *Id.* at A1.

[34] *See id.*

[35] D.C. Council, Comm. on Human Servs., Report on Bill 7-401 (Oct. 6, 1988) at 3.

[36] *See* Frigid Temperature Protection Amendment Act of 1988, *codified at* D.C. Code §§ 3-206.3 (b)(3) (1994), *recodified at* D.C. Code § 4-206.3 (b)(3)

(continued…)

Thus, by making the obligation of the District to provide families with apartment-style shelter, a mandatory Continuum of Care provision, the HSRA merely reaffirmed a pre-existing, well-considered obligation.[37] *See* D.C. Council, Comm. on Human Servs., Report on Bill 16-103 at 1 (Apr. 21, 2005) (explaining that the legislation was intended "to reaffirm the District of Columbia's commitment to addressing the problem of homelessness"). At the same time, the HSRA created an entitlement-to-sue provision for severe weather shelter.[38]

---

(…continued)
(2001), *repealed by* Homeless Services Reform Act of 2005, D.C. Law No. 16-35 § 32. In its report, the Committee on Human Services "unequivocally state[d] that it [wa]s not its intent to use government public buildings as mass shelters for housing homeless families." The Committee specifically directed the District to "refrain from placing any families at the Randall School Gym or any other mass shelter facilities." D.C. Council, Comm. on Human Servs., Report on Bill 7-401 at 3-4 (Oct. 6, 1988).

[37] The HSRA's definition of "apartment style" shelter mirrors that contained in the 1988 Emergency Shelter Act. *Compare* D.C. Code § 4-751.01 (3) (2012 Repl.), *with* D.C. Code § 3-206.3 (b)(1) (1988); *see supra* note 36.

[38] This entitlement to sue was not entirely new, but it did change the status quo from the previous fifteen years. The first law mandating services for the homeless in the District, the Overnight Shelter Act of 1984, had contained authorization for judicial enforcement by a private right of action. The Act gave "all persons in the District of Columbia" the right "to adequate overnight shelter," and Section 7, entitled "Judicial Review," gave "any person aggrieved by a failure of the District of Columbia to provide the overnight shelter declared to be a right by this chapter" a right of action to sue "in any court of competent jurisdiction" for

(continued…)

Preliminarily, we acknowledge the common-sense proposition that legislatures make a statutory obligation judicially enforceable by a private right of action precisely in order to promote compliance with that obligation. The Council was well-aware that the District had struggled over the years to meet its statutory obligation to provide apartment-style shelter to homeless families during periods of hypothermic/severe weather. This at least suggests that when the Council created an enforceable entitlement to "severe weather shelter" under § 4-755.01 (a), one of its aims was to reinforce the District's long-standing obligation to provide homeless families with the shelter they demonstrably needed in severe weather: apartment-style shelter.

More particularly, to the extent the entitlement-to-sue provision was debated, the discussion focused on whether it created a right to shelter on demand. The Committee on Human Services refuted that notion, and we take particular note of what the Committee said *and* of what it did not say. The Committee did not assuage the District's fears by explaining that all the entitlement-to-sue provision

---

(…continued)
"such relief as [the court] deems appropriate." *See* District of Columbia Right to Overnight Shelter Act, D.C. Code §§ 3-601 et seq. (1985), *amended by* D.C. Emergency Overnight Shelter Amendment Act of 1990, D.C. Law No. 8-197, 37 D.C. Reg. 4815, *repealed by* Homeless Services Reform Act of 2005, D.C. Law No. 16-35 § 32 (b), (d). This private right of action was repealed in 1990. *See id.*

did was to authorize a private right of action to obtain some sort of minimal, box-type shelter in severe weather conditions (thereby providing support for the District's current litigation position). Instead, the final Committee report explains that the concern that the HSRA "will create an entitlement and trigger unforeseeable cost through mandating the creation of new programs" was "unwarranted," because the District already had an obligation to provide shelter in severe weather, which the Committee recognized the District was attempting to fulfill.[39] In other words, the Committee report indicated that the entitlement to sue simply tracked the District's preexisting legal obligations to provide homeless families and individuals with the shelter mandated by statute.

That the entitlement-to-sue in severe weather tracks the District's legal obligation to provide homeless families with the shelter required by statute is also supported by the legislative history to the 2010 amendments to the HSRA. Once again, the District faced a crisis in providing shelter to homeless families. Having exhausted its supply of apartment-style shelter, the District sought out other

---

[39] *See, e.g.*, D.C. Council, Comm. on Human Servs., Report on Bill 16-103 at 17 (Apr. 21, 2005).

options.[40]  Over the objection of homeless persons' advocates, an amendment to the HSRA was proposed in the Council that would have given the District broad statutory authority to "place homeless families in non-apartment-style severe weather shelters."[41]

Councilmember Wells, the Chair of the Committee on Human Services, acknowledged that the District's failure to place homeless families in apartment-style shelter was "a legal liability for the District" and determined that "it would not be good government to leave that vulnerability open."[42]  But he did not eliminate that "vulnerability" by endorsing the District's proposed amendment.

---

[40] These options included housing families at the D.C. General Shelter, which the Director of DHS, Clarence H. Carter, admitted "does not comply with current law." *See* D.C. Council, Comm. on Human Servs., Report on Bill 18-1059 at 17 (Dec. 1, 2010).

[41] *See* "Homeless Services Reform Amendment Act of 2010," B18-1059 (as referred to the Committee on Human Services, Oct. 21, 2010), *reprinted in* D.C. Council, Comm. on Human Servs., Report on Bill 18-1059 (Dec. 1, 2010). *See also, e.g.*, D.C. Council, Comm. on Human Servs., Report on Bill 18-1059 (Dec. 1, 2010) (testimony of Tulin Ozdeger, Civil Rights Director at National Law Center on Homelessness & Poverty, Nov. 8, 2010) ("Let us be clear on what 'non-apartment-style' means.  It means cramming lots and lots of families with young children into a large room, and requiring them to sleep, eat, and use the bathroom communally.  This puts children at tremendous risk.").

[42] *Id.* at 26.

Instead, he drafted compromise legislation that gave the District a safety valve when apartment-style shelter was unavailable, but that maintained the prohibition on congregate-style shelter for families. The Mayor was thus "authorized to place homeless families in non-apartment-style shelters that are private rooms only when no apartment-style shelters are available."[43]

Against this historical backdrop, and particularly in light of the legislative history of the "private room" provision, we are further persuaded that, for homeless families, the apartment-style shelter requirement is part of the enforceable entitlement to severe weather shelter.

\*         \*         \*

In light of the text of the statute, our analysis in *Baltimore*, and the legislative history of the HSRA, we hold that the enforceable entitlement to severe weather shelter, set out in D.C. Code § 4-755.01 (a), includes, for homeless

---

[43] D.C. Code § 753.01 (d)(2).

families, the right to sue to obtain apartment-style shelter, or private rooms if no apartment-style shelters are available. The District did not place the plaintiff families and other members of their class in apartment-style shelters or private rooms on the frigid nights in question here; instead, the District placed them in communal recreation centers with partitions. In so doing, the District violated the HSRA, and we therefore agree with the Superior Court that the plaintiff families have demonstrated a substantial likelihood of success on the merits.

### B.        Impossibility of Compliance

The District additionally argues that the trial court abused its discretion in granting the plaintiff families injunctive relief by failing to consider the District's argument that it would be unable to comply with the requested injunction if granted. The District presses this court to recognize "impossibility" as a "highly relevant, if not a required consideration in [a] court's decision to grant" preliminary injunctive relief. We decline this invitation.

The four-factor test for the issuance of an injunction is well-established in this jurisdiction. *See Wieck*, 350 A.2d at 387. *See also In re Estate of Reilly*, 933

A.2d 834, 834 (D.C. 2007); *Zirkle v. District of Columbia*, 830 A.2d 1250, 1255-56 (D.C. 2003); *Sierra Club*, 670 A.2d at 361; *Fountain v. Kelly*, 630 A.2d 684, 688 (D.C. 1993); *Wisc. Ave. Assocs., Inc. v. 2720 Wisc. Ave. Coop. Ass'n, Inc.*, 385 A.2d 20, 23 n.3 (D.C. 1978). Although a court must take into account the balance of the equities and whether the issuance of a preliminary injunction would disserve the public interest, there is no requirement that a court separately consider assertions of an inability to comply with the requested injunction.

The assortment of decisions from other state appellate courts to which the District cites rest on distinctive facts that do not support its argument for the addition of an impossibility requirement as a universal consideration in granting injunctive relief. Likewise, the one federal case to which the District cites, *Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir. 2005), is clearly exceptional. In *Cobell*, the government established that the cost of complying with the injunction would be so exorbitant (in the billions of dollars) that even the plaintiffs agreed that compliance was literally impossible and that the injunction should accordingly be modified. *Id*. at 1072. *Cobell* provides little support for the argument that this court must invite or require Superior Court judges to rule upon "impossibility" arguments as part of the standard preliminary injunction analysis.

At any rate, the facts presented by the District simply did not come close to proving that it would be "impossible" for the District to comply with the trial court's order. To begin with, the District presented no evidence of its efforts to increase its stock of apartment-style housing. Apartment-style housing is the statutorily preferred placement for homeless families; only if it is not available may the District place families in private rooms. *See* D.C. Code § 4-753.01 (d)(2). Regarding placement in private rooms, the District presented some testimony about its efforts to locate hotel rooms for families in need of severe weather shelter. This testimony revealed that the District had no Memoranda of Understanding with any hotels, and that it had one staff person following "lead[s]" of unknown provenance, placing phone calls, and conducting Google searches on a daily basis to identify available hotel rooms. While this testimony demonstrates that the District was not inactive, it does not come close to establishing that it would be impossible for the District to comply with the sought-after injunction.[44]

---

[44] Indeed, although the trial court declined to separately assess impossibility, it stated that it was "somewhat skeptical of the District's claim . . . given how quickly they complied with" the earlier-issued TRO.

**C. Likelihood of irreparable harm**

Lastly, the District challenges the trial court's ruling that the plaintiff families made a substantial showing of a likelihood of irreparable harm. The District has preserved two arguments on this issue: (1) the expert testimony presented by the plaintiff families should have been excluded, and (2) the evidence of irreparable harm was insufficient.[45]

### 1. *The admission of expert testimony*

The District argues that the Superior Court abused its discretion in admitting the testimony of Danielle Rothman, whom the court certified as an expert in child psychology with an emphasis on at risk and homeless youth. Specifically, the

---

[45] On appeal, the District additionally argues both that expert Danielle Rothman's testimony was inadmissible because it was not held with a "reasonable degree of medical and psychological certainty," and that it was insufficient because it was "expressed in terms of possibilities, not probabilities." The District further makes what appear to be redressability arguments related to the sufficiency of the injunction to address certain specific alleged injuries. The District did not make these arguments to the trial court, and they are therefore not preserved. In the absence of any argument why we should nevertheless address them, we decline to do so. *See Pajic v. Foote Props.*, LLC, 72 A.3d 140, 145 (D.C. 2013) ("In general, this court's review on appeal is limited to those issues that were properly preserved," although "in exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record, we may deviate from the usual rule.") (internal quotations and citations omitted).

District asserts that Ms. Rothman was "not qualified to render an expert opinion in this case," because she "was not a licensed psychologist, nor a member of any professional psychological organization," had not interviewed anyone who had stayed at the recreation centers or observed anyone staying in a recreation center, and had based her opinion testimony "solely on the adult plaintiff's in-court testimony."

We entrust the assessment of an expert's qualifications as such to the sound discretion of the trial court. *See Zoerb v. Barton Protective Servs.*, 851 A.2d 465, 472 n.8 (D.C. 2004); *Glorious Food, Inc. v. Georgetown Prospect Place Assocs.*, 648 A.2d 946, 948 (D.C. 1994). An expert witness must possess "sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier [of fact] in his search for truth." *Glorious Food, Inc.*, 648 A.2d at 948. The witness may be qualified to testify as an expert on the basis of his or her experience in their field; formal academic training or licensure is not necessarily a prerequisite. *Id.* at 948 n.3.[46]

---

[46] *See also Joyner v. Estate of Johnson*, 36 A.3d 851, 859-60 (D.C. 2012) (trial judge did not abuse discretion in admitting professional title abstractor who lacked professional license or advanced degree to testify to results of title search); *Jones v. United States*, 990 A.2d 970, 979 (D.C. 2010) (FBI Behavioral Science Unit researcher with twenty-years' research experience permitted to give opinions on "victim psychology" despite lack of formal academic training in psychology).

Here, the expert witness possessed a master's degree in psychology, and was close to finishing a doctorate in clinical psychology, with a focus on child psychotherapy and child psychological assessment. She had experience doing clinical work (albeit supervised) with at-risk children through shelters in Boston, New York, and Washington, D.C., including at the D.C. General Shelter and the Reginald S. Lourie Center for Infants and Young Children We discern no abuse in the Superior Court's determination that Ms. Rothman, by virtue of her training, was sufficiently qualified to testify as an expert in this case.

Moreover, there was no requirement that Ms. Rothman have toured the District of Columbia shelters or interviewed witnesses in order to testify as an expert. We do not require that expert witnesses have relied on any particular source of facts or data in reaching their conclusions; rather, "the critical inquiry" is whether the facts or data relied on are "of a type on which experts in their profession reasonably rely." *In re Melton*, 597 A.2d 892, 901 (D.C. 1991); s*ee Jones*, 990 A.2d at 979 (expert witness need not have interviewed specific victims of alleged harm in order to testify to the potential consequences of the harm). Obtaining knowledge of the particular facts of a case from in court testimony (or hypotheticals based on in court-testimony) is a standard practice. *See, e.g.*,

*Sanchez v. District of Columbia*, No. 13-CT-128, 2014 WL 5737408 (D.C. Nov. 6, 2014) ("[T]he presence in the courtroom of an expert witness who does not testify to the facts . . . will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate understanding of the testimony as it evolves before the jury.") (quoting *Morvant v. Constr. Aggregates Corp.*, 570 F.2d 626, 629-30 (6th Cir. 1978)).

On this record, we find no basis to conclude that the Superior Court abused its discretion in certifying Ms. Rothman as an expert and admitting her testimony.

> 2. *The sufficiency of the evidence of the likelihood of irreparable harm.*

The District maintains that, even with Ms. Rothman's testimony, the trial judge abused his discretion by issuing the preliminary injunction because the evidence was insufficient to establish a likelihood of irreparable harm. The Superior Court was required to consider whether the plaintiff families demonstrated that they were "in danger of suffering irreparable harm during the pendency of the action" if the injunction was not granted. *See District Unemp't*

*Comp. Bd.*, 365 A.2d at 787 n.1; *Wieck*, 350 A.2d at 387. Moreover, the Superior Court was empowered to grant a preliminary injunction upon a finding of "either a high probability of success and some injury, or vice versa." *In re Estate of Reilly*, 933 A.2d 830, 837 (D.C. 2007) (citing *Akassy v. William Penn Apartments, Ltd.*, 891 A.2d 291, 310 (D.C. 2006)). Our review is confined to "examining the trial court's findings and conclusions to see if they are sufficiently supported by the record." *Wisc. Ave. Assocs.*, 385 A.2d at 23.

In concluding that the plaintiff families faced a danger of irreparable harm, the Superior Court considered "powerful and compelling" testimony, which it credited, from individuals who had been housed at the recreation centers about the conditions there. The court also considered Ms. Rothman's expert testimony about the potential long-term adverse effects of those conditions on children. This evidence provided substantial support for his ruling. Moreover, in reviewing the court's assessment of irreparable harm in this case, we cannot ignore the HSRA's undisputed requirement that families be placed in apartment-style shelter or if unavailable private rooms. This requirement was a direct legislative response to the demonstrated harms that occur when families are housed in congregate

shelters.[47] We discern no abuse of discretion in the Superior Court's determination that the violation of a statutory obligation meant to protect homeless families put those families at risk to suffer the very harm the statute was meant to forestall.

For the foregoing reasons, we affirm the judgment of the Superior Court.

*So ordered.*

---

[47] The committee report for the Frigid Temperature Protection Amendment Act of 1988 specifically referenced the *Walls v. Barry* litigation, "a lawsuit filed by families forced to stay at the Randall School gym this past winter." D.C. Council, Comm. on Human Servs., Report on Bill No. 7-401 at 4 (Oct. 6, 1988). The Committee Report quoted from the preliminary injunction in which the court ruled that placement at the gym was "unsuitable for families" and "present[ed] a substantially increased risk of psychological harm, particularly to children because of the crowded conditions and lack of privacy." *Id.*